CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
09/23/2019

JULIA C. DUDLEY, CLERK
BY: /s/ J. JONES
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| LISA F.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 3:18-cv-00031 |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| ANDREW M. SAUL, | ) | By:   Joel C. Hoppe |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant.[2] | ) | |

Plaintiff Lisa F. asks the Court to review the Commissioner of Social Security's final

decision denying her claim for supplemental security income ("SSI") under Title XVI of the

Social Security Act (the "Act"), 42 U.S.C. §§ 1381–1383f. The case is before me by the parties'

consent under 28 U.S.C. § 636(c). ECF No. 13. Having considered the administrative record, the

parties' briefs, and the applicable law, I cannot find that substantial evidence supports the

Commissioner's final decision. Accordingly, the decision will be reversed, and the case

remanded under the fourth sentence of 42 U.S.C. § 405(g).

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

*Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it

may not "reweigh conflicting evidence, make credibility determinations, or substitute [its]

judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012).

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Andrew M. Saul became Commissioner of Social Security in June 2019. Commissioner Saul is hereby substituted for the former Acting Commissioner, Nancy A. Berryhill, as the named defendant in this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed

in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 416.920(a)(4).[3] The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

In December 2014, Lisa filed for SSI alleging that she was disabled by degenerative disc and joint disease, chronic back pain, and arthritis, among other medical conditions. *See* Administrative Record ("R.") 15, 67–68, 173–76, ECF No. 11. Lisa was forty-six years old, or a "younger person" under the regulations, when she allegedly became disabled in June 2014. *See* R. 24, 67; 20 C.F.R. § 416.963(c). Disability Determination Services ("DDS"), the state agency, denied her claim initially in June 2015, R. 66–79, and upon reconsideration that September, R. 80–94. In December 2016, Lisa appeared with a non-attorney representative and testified at an administrative hearing before ALJ Susan Smith. R. 31–57. A vocational expert ("VE") also testified at this hearing. R. 53–56.

ALJ Smith issued an unfavorable decision on March 13, 2017. R. 15–26. Lisa had the following "severe impairments: hip joint dysfunction status post replacement; carpal tunnel syndrome and tendinitis; degenerative disc disease of the cervical and lumbar spine; chronic obstructive pulmonary disease (COPD); and arthritis." R. 17. These impairments did not meet or medically equal any listed impairment. R. 19. ALJ Smith then evaluated Lisa's residual

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

functional capacity ("RFC") and found that she could perform "sedentary work"[4] with additional restrictions:

> [O]ccasionally climb ramps and stairs, stoop, kneel, and balance; never crouch and crawl; never climb ladders, ropes, and scaffolds; should avoid concentrated exposure to hazards including dangerous moving machinery, uneven terrain, and unprotected heights; should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation; and frequently use hands bilaterally for fingering and handling.

R. 19. The limitation to sedentary work ruled out Lisa's return to her past jobs as a waitress and certified nursing assistant. R. 24; *see* R. 53–54. Finally, based on this RFC finding and the VE's testimony, ALJ Smith concluded at step five that Lisa was not disabled because she could perform three sedentary occupations (order clerk; inspector, sorter, and tester; materials packer and sealer) that offered a significant number of jobs in the national economy. R. 25; *see* R. 54. The Appeals Council denied Lisa's request for review, R. 1–3, and this appeal followed.

## III. Discussion

Lisa argues that ALJ Smith did not give "good reasons" for discounting a treating physician's medical opinion that, because of her severe lumbar and hip pain, Lisa "cannot lift, bend, stoop," or walk more than one hundred feet and frequently needs to change positions. Pl.'s Br. 5–6 (citing R. 436), ECF No. 15. This opinion conflicted with ALJ Smith's RFC findings that Lisa could frequently lift ten pounds, occasionally stoop (i.e., bend at the waist), and sit for about six hours and stand/walk for about two hours during a normal eight-hour workday. *See* R.

---

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. § 416.967(a). A person who can meet these modest strength requirements can perform "the full range of sedentary work" if he or she can sit for about six hours and stand and/or walk for about two hours in an eight-hour workday. *Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002); *see* SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996). Younger adults "who are limited to no more than sedentary work by their medical impairments have very serious functional limitations," but they rarely are presumed to be disabled. SSR 96-9p, 1996 WL 374185, at *3; *see* 20 C.F.R. pt. 404, subpt. P, app. 2 § 201.00(h).

19, 23–24, 75–76; 20 C.F.R. § 416.967(a); SSR 96-9p, 1996 WL 374185, at *3, *8. It also

bolstered Lisa's testimony that she must "shift positions to help alleviate her overall pain," R. 20

(citing R. 48–49, 52), which ALJ Smith did not include in her RFC finding.

*

A claimant's RFC is her "maximum remaining ability to do sustained work activities in

an ordinary work setting" for eight hours a day, five days a week despite her medical

impairments and symptoms.[5] SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis

omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case

record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect

specific, credibly established "restrictions caused by medical impairments and their related

symptoms," including pain, that affect the claimant's "capacity to do work-related physical and

mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio*, 780 F.3d at 637–40;

*Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by*

2016 WL 649889 (W.D. Va. Feb. 17, 2016). The ALJ has broad (but not unbounded) discretion

to determine whether an alleged limitation is supported by or consistent with other relevant

---

[5] "Symptoms" are the claimant's own description of her medical impairment. 20 C.F.R. § 416.928(a). The regulations set out a two-step process for ALJs to evaluate symptoms as part of the RFC assessment. *See Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 416.929. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [her] ability," *id.*, to work on a regular and continuing basis, *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015). "The second determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects" after considering all the relevant evidence in the record. *Lewis*, 858 F.3d at 866; *see Mascio*, 780 F.3d at 639; *Hines*, 453 F.3d at 565. The ALJ must give specific reasons supported by "references to the evidence" for the weight assigned to the claimant's statements, *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013), and, when necessary, she should "explain how [s]he decided which of [those] statements to believe and which to discredit," *Mascio*, 780 F.3d at 640. A reviewing court will uphold the ALJ's credibility determination if her articulated rationale is legally adequate and supported by substantial evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)).

evidence in the claimant's record. *See Perry v. Colvin*, No. 2:15cv1145, 2016 WL 1183155, at

*5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

Generally, a reviewing court will affirm the ALJ's RFC findings when it is clear that she

considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of*

*Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and she built an "accurate and logical

bridge from that evidence to h[er] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th

Cir. 2018) (quotation marks and brackets omitted). *See Thomas v. Berryhill*, 916 F.3d 307, 311–

12 (4th Cir. 2019); *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 662 (4th Cir. 2017).

A.      *Summary*

Lisa provided the following information in her testimony at the administrative hearing

and her submissions to the state agency. Lisa stopped working as a certified nursing assistant

around June 2014 because she "couldn't lift the patients" and "walking was becoming

ridiculously painful." R. 37. She had a total hip replacement on the right in January 2015,

followed by a total hip replacement on the left in April 2016. R. 39–40. Her chronic pain was

"even worse" after the second surgery, but her doctors said the prosthetic joints "look[ed] good."

R. 41. Lisa usually used a walker or a crutch, R. 42–43, on the "very rare[]" occasions when she

went out into the community, R. 72 (June 2015). *See also* R. 216. She could "get dressed,

shower, and take care of morning" activities, but she did "everything slower" than she used to. R.

71 (June 2015); *see also* R. 211 (Jan. 2015). She needed "help bending over to get [her] shoes

and socks on." R. 71; *see also* R. 215. Lisa could prepare microwave meals, but her mother did

"mostly all" of the cooking, cleaning, and shopping. R. 214–16. When Lisa did go grocery

shopping "once a month" she used a motorized cart to get around the store and someone went

with her to get things off the shelves. R. 216.

By December 2016, Lisa's chronic back and hip pain was "pretty much" uncontrolled. R. 43. Sometimes she used "marijuana or methadone," R. 52–53, to supplement the four prescription pain medications she took every day, R. 258. Trigger point injections "sometimes" dulled her back pain "a little bit," but only for "a few days" after each treatment. R. 44. Lisa spent most days lying in bed with her legs elevated, R. 43, or switching between sitting, standing, and lying down, R. 213–15 (June 2015). *See also* R. 48–49, 52 (Dec. 2016); R. 71 ("[M]ust alternate between sitting and standing because of pain."). She could sit for about 30 minutes before needing to reposition herself or get up and take "a few steps around." R. 48; *see also* R. 52, 71, 86, 211, 213. She could stand for about 10 minutes and walk at most 70 feet, but only if she had a crutch or walker for support. R. 48–49; *see also* R. 71–72 ("Cannot walk very far because of pain. . . . [U]ses a walker [that] was prescribed."); R. 219 (uses prescription walker when "pain gets very severe"). She was not sure if she could lift or carry something weighing between five and ten pounds. R. 50; *see* R. 72. Lifting, sitting, standing, walking, climbing stairs, kneeling, and bending aggravated the constant pain her neck, back, hips, and legs. *See* R. 71–72, 213, 218, 230. She also had trouble navigating uneven terrain. *See* R. 45.

\* \*

The medical records show that Lisa received most of her healthcare in the University of Virginia ("UVA") Health System. The earliest clinic note is from January 2011, R. 656, roughly three years before Lisa first reported that she "stopped working due to chronic pain," R. 370 (Feb. 2014). On January 18, 2011, Lisa told Wendy Westfield, M.D., that her neck and lower back pain were getting worse, possibly because she had been "working excessive hours." R. 656. Recent MRI of the cervical spine "showed severe narrowing of the left neuroforamin and moderate to severe narrowing of the right neuroforamin" at C3-C4 secondary to "a disc osteophyte complex." R. 656; *see* R. 329–30. Lisa also had chronic lumbar degenerative disc

disease. R. 656; *see* R. 266, 326–27. She took Percocet, baclofen, and ibuprofen several times each day, but they were "not doing as well to control her pain lately." R. 656. On January 7, 2014, Dr. Westfield terminated Lisa's "narcotic pain management care" because she tested positive for Methadone. R. 638; *see* R. 294–95. Dr. Westfield agreed to continue as Lisa's primary care provider, but she would not prescribe any more Percocet or other narcotic pain medications. R. 638.

On March 11, 2014, Lisa saw Preston Grice, M.D., for regularly scheduled cervical-lumbar trigger point injections. R. 372–74; *see* R. 783 (Dr. Grice "give[s] injections every 6 weeks"). Dr. Grice noted Lisa was "having extreme lumbosacral pain and had extreme difficulty ambulating secondary to the pain." R. 374. He ordered an MRI, which showed "[m]ultilevel degenerative changes of the lumbar spine . . . , most prominently at the L4-L5 and L5-S1 levels" with diffuse disc bulge, "moderate" central canal stenosis, "mild" bilateral neuroforaminal stenosis, and "mild" to "moderate" bilateral facet arthropathy. R. 326–27. These findings were "slightly advanced compared to MRI from [June] 2010." R. 327. In May 2014, Dr. Grice performed L4-5 and L5-S1 bilateral facet joint injections. R. 382–83. That procedure "did not produce any benefit." R. 388.

Also in May 2014, Lisa established primary care with Andrew Hawkins, M.D., because she believed Dr. Westfield "was not going to see her anymore." R. 783. She was taking three to four doses of 600 mg gabapentin, 10 mg baclofen, and 800 mg ibuprofen throughout the day, plus 5 mg oxycodone every six hours as needed for pain. R. 783–84. She could not "stand upright due to chronic lower back pain," and she had new pain from the "really tight" muscles in her neck. R. 783. On exam, Lisa had slightly limited range of motion in the lower back and "almost jump[ed] off the table" when Dr. Hawkins "barely pressed" on the "paraspinal muscles

in the L2-5 region on [the] right side." R. 784. Her gait, strength, sensation, and straight-leg raising tests were normal. *Id.* Dr. Hawkins was "a bit leery" about taking over Lisa's narcotic medications. R. 785 (spelling corrected). He said he would follow up with Lisa after he reviewed Dr. Westfield's records. *Id.*

On June 3, 2014, Lisa returned to Dr. Grice's clinic "having recently had a bad flare up in both her neck and back pain," R. 387, with numbness into her arms and legs, R. 388. An MRI of the cervical spine showed "advanced multilevel degenerative changes . . . which appear[ed] slightly progressed" at C4-5 compared to the January 2011 study, "[s]evere left-sided facet arthropathy" at C2-C3 to C3-C4 with "marked arthrosis" and a fused facet joint, and "mild" to "moderate" narrowing throughout. *Id.* On exam, Lisa exhibited decreased range of motion and muscular tenderness or pain in the neck and back, as well as "bony tenderness and pain" in the cervical back. R. 390–91. Dr. Grice administered trigger point injections and prescribed a "[v]ery short course of oxycodone." R. 392–93. Lisa underwent four additional rounds of cervical and/or lumbar trigger point injections over the next six months. *See* R. 265–68, 269–70, 275–77, 287.

On June 18, 2014, Lisa followed up with Jessica James, D.O., about neck and lower back pain with numbness and tingling in the extremities. R. 397–99. Trigger point injections "did help some," but Lisa was "not really noticing any kind of significant benefit" from amitriptyline (Elavil), baclofen, and gabapentin. R. 397–98. Lisa was "using [a] walker" on exam. R. 398. Dr. James refilled the Neurontin and Elavil, increased the baclofen, and added meloxicam (Mobic) for joint pain. R. 397–99. She also referred Lisa to an orthopedic spine surgeon. R. 399. Lisa went to UVA's Spine Center in early September 2014. She walked "with a normal gait without any assistive devices" or "evidence of ataxia" and had full strength, sensation, and painless range of motion throughout. R. 273–74. X-rays showed "[m]ultilevel loss of disc height" in the

cervical spine with "[p]ossible fusion of the C3-C4 facets," "[m]ild progressive degenerative change[s] at L4-L5 and L5-S1," and "[s]evere progressive degenerative changes" in both hips, left greater than right. R. 332. Adam Shimer, M.D., did "not recommend surgical intervention [because] her symptoms [were] predominately axial pain" attributable to degenerative disc disease in the cervical and lumbar spine. R. 274 ("When coming from degenerative disc disease surgery is not predictable for improvement of axial neck and back pain."). He urged Lisa to "continue conservative treatment" with Dr. Grice and her primary-care provider. *Id.*

Lisa returned to Dr. James's office in mid-October. R. 280. She complained of left-hip pain and reported Mobic was not helping. *See id.* On November 14, Lisa saw Thomas Brown, M.D., after X-rays showed "significant" degenerative joint disease in both hips. R. 281. She reported "left hip pain for over a year" and "similar symptoms in the right hip more recently." *Id.* The pain was worse with activity, but she did not use a cane or other assistive device. *Id.* On exam, Lisa walked with a "mild limp" and endorsed "severe pain" with rotation of both hips. R. 283. She also had significantly decreased range of motion bilaterally, left more so than right. *Id.* Dr. Brown assessed osteoarthritis of both hips and scheduled Lisa for total hip arthroplasty ("THA") on the left and intra-articular steroid injections on the right. *See* R. 284.

Lisa asked to have the right hip replaced first, R. 39–40, which Dr. Brown performed on January 19, 2015, R. 407. Lisa was admitted to the hospital for a few days for pain control and physical therapy. *See* R. 410, 412, 420–21. On January 21, she was discharged "home with 24/7 supervision/assist" plus in-home physical therapy, R. 412, 420, and instructions to "[b]ear weight as tolerated" on the right leg, take certain "hip precautions," and not drive for at least six weeks. R. 424–26. The discharging physician sent Lisa home with a front-wheeled walker "needed for safety with ambulation" until she was cleared to walk without it. *See* R. 478 ("Duration of use:

Indefinite").

On February 15, Lisa was transported to UVA's emergency room with severe right-hip pain. R. 479. A few days earlier, she "slipped while using [the] walker and heard a pop in her right hip." *Id.*; *see also* R. 488. Taking Dilaudid every four hours helped, but she had not been able to bear any weight on her right leg for the past thirty-six hours. R. 479, 482; *see also* R. 488, 495. On exam, Lisa exhibited right "hip deformity [and] inability to straighten [that] leg," R. 482; diffuse tenderness to palpation over the right hip and thigh, R. 482, 490; "restricted" but "relatively painless" range of motion in that hip, R. 482, 487; "[n]egative straight leg and cross leg maneuver," R. 490; pain with resistance to hip flexion, R. 490; and "difficulty" walking, R. 487. An X-ray ruled out "fracture or dislocation" of the prosthetic joint. R. 482. Lisa's pain still was "not tolerable" on Fentanyl, Dilaudid, and Vicodin, and she expressed concern that she was not "able to manage her pain or ambulate at home." R. 482. She was admitted with "intractable pain" for observation and inpatient physical therapy. *Id.* Lisa was discharged on February 18 with "improved" pain control and "increased" range of motion in the right hip. R. 499.

On February 24, Lisa followed up with Alexander Salomon, M.D., her primary care provider. R. 500–01. She reported continued "severe pain" since her right THA despite taking Dilaudid, Percocet, Neurontin, Elavil, Zanaflex, baclofen, and ibuprofen throughout the day. R. 502, 503. Dr. Salomon explained that he could not prescribe narcotics and gave her a schedule to come off the Dilaudid. R. 506. He also filled out a "SNAPET Medical Evaluation" form in which he opined that Lisa would never be able "to participate in employment [or] training activities in any capacity," R. 435, because she must change positions frequently and "cannot lift, bend, stoop," or walk more than 100 feet, R. 436. He attributed these limitations to "lumbar disc herniation with prev[ious] surgery," right hip replacement, and left hip arthritis. R. 436. Three

weeks later, Lisa told her hand surgeon that she was "[s]till using [a] walker when out of the house" and had "severe" pain. R. 507.

Lisa saw Dr. Grice and Dr. Salomon four times each over the next several months. *See* R. 513–22, 540–42, 584–602, 671–77. Dr. Grice administered cervical-lumbar trigger point injections and usually gave Lisa a limited supply of Percocet. *See* R. 514–16, 542, 586, 601–02. The injections provided "some degree" of pain relief. R. 518. Dr. Salomon's progress notes show that Lisa consistently reported severe back and left hip pain despite taking various combinations of Percocet, Neurontin, Ultram, Oxycodone, Elavil, Zanaflex, Flexeril, baclofen, and/or 800 mg ibuprofen throughout the day. *See* R. 517–22, 589–93, 594–99, 671–74. On exams, she exhibited "decreased" range of motion and/or "tenderness" in the cervical back, R. 522, 593, 598, 676; "tenderness" in the lumbar back, R. 522; and "tenderness and bony tenderness" in the right hip, R. 593, 598, 676. X-rays taken in June 2015 showed "[p]ersistent severe degenerative changes of the left hip with joint space narrowing and osteophytosis," osteopenia, and "[m]ild degenerative changes of L5-S1 facet joints and sacroiliac joints." R. 606. The prosthetic joint looked stable. *Id.* Dr. Salomon agreed that Lisa needed her left hip replaced, too. R. 589. That surgery was delayed several months while Lisa recovered from fractured ribs she sustained in an accident. R. 672; *see* R. 615–27; 679, 780. Dr. Salomon prescribed Percocet and Oxycodone to help manage Lisa's pain until she could be seen by orthopedics. *See* R. 589–91, 594–96, 671–76.

Lisa reestablished primary care with Dr. Hawkins in early 2016. R. 779–82. She described her approach to pain management "up to th[at] point [as] getting meds from 'friends and family' and a doctor here or there." R. 780. Dr. Salomon had prescribed Percocet, which "worked" on her pain, but he discharged Lisa from his practice after she took extra pills from her brother. *Id.* Dr. Hawkins opined that Lisa's hip pain seemed "legitimate," but he explained that

"she can't expect physicians . . . to continue prescribing narcotic pain medicines when she gets them from different providers . . . and uses friends' pain medicines to help with occ[asional] breakthrough" symptoms. R. 781. Lisa returned to Dr. Hawkins's clinic four days later. R. 776–78. She admitted a very recent history of using Percocet and Methadone obtained from friends and family, which she took because "nobody [would] give her anything" for her hip. R. 777. On exam, Dr. Hawkins observed that Lisa was "limping considerably" and walked with an antalgic gait favoring the left side. R. 778. He acknowledged Lisa had "significant pain issue w[ith] the left hip" and prescribed a limited number of Oxycodone-Acetaminophen "to get her through" until she had her left THA in a few weeks. *Id.*; *see also* R. 773–75.

Dr. Brown performed the left THA on April 11, 2016. R. 697–99. Lisa's surgery went well, R. 699, and she had "adequate" pain control while waking up from anesthesia, R. 701. By that evening, however, she reported "10/10 pain" not controlled on multiple intravenous narcotic medications. R. 703–04. She told a nurse that she wanted to "'shoot [her]self'" because she was in "'too much pain.'" R. 704; *see* R. 705–06. Lisa continued "with inconsistently controlled postoperative pain" while hospitalized. R. 717; *see* R. 710, 718, 721–23, 725–26, 732–34. On April 13, she was discharged with instructions to "[b]ear weight as tolerated" on the left leg, take certain "hip precautions," and not drive for at least six weeks. R. 746–48. Lisa still needed the walker with stand-by assistance when standing or walking. R. 740–41. She was set up to receive skilled physical therapy at home, followed by outpatient services.[6] *See* R. 741, 748.

On May 2 and June 24, Lisa reported "increased" pain in the left hip and groin, especially with flexion, during follow-up visits to Dr. Brown's clinic. R. 749, 750. She presented both times with an antalgic gait using a "cane/walker" and endorsed "mild" pain with "gentle" range of

---

[6] There are no home-health or outpatient physical therapy notes in the administrative record.

motion on exam. *Id.* X-rays showed bilateral hip arthroplasties without evidence of complication or fracture. R. 755–56. On June 24, Dr. Brown's physician assistant prescribed Oxycodone and noted she would "discuss the possibility of iliopsoas bursa injections" with the surgeon. R. 751; *see* R. 41–42, 51. Around the same time, Lisa told Dr. Hawkins that she still had "significant pain" and her "gait [was] way off." R. 769–70. On exam, Lisa walked with an antalgic gait and her straight-leg-raising test was "positive at 30 degrees on both sides." R. 771. X-rays of the lumbar spine showed "[m]ild disc height loss and endplate sclerosis with small osteophytes at L4-5 and L5-[S]1." R. 790. Lisa still walked with an antalgic gait in September 2016. R. 759. Dr. Hawkins increased her Flexeril and told Lisa to follow up with orthopedics about the continued pain and possible "'bursitis'" in her left hip. R. 758, 760.

B.      *The ALJ's Decision*

ALJ Smith considered Lisa's physical impairments, symptoms, and alleged functional limitations throughout her written decision. *See* R. 17, 19–24. At step two, she found that Lisa's arthritis, degenerative disc disease of the cervical and lumbar spine, and bilateral "hip joint dysfunction status post replacement" were "severe" medical impairments because they "more than minimally limit[ed] the ability to perform basic work activities," R. 17, which, according to the regulations include physical functions like sitting, standing/walking, and lifting/carrying any amount of weight, 20 C.F.R. § 416.921(b)(1). She could "find no evidence that the combined clinical findings from [these] impairments" met or medically equaled a listing, R. 19, but she neither "identified the relevant listed impairments" nor "compared [any] of the listed criteria to the evidence" in Lisa's medical record, *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).

Turning to Lisa's RFC, ALJ Smith briefly summarized Lisa's statements to the agency, R. 20, 23; select parts of relevant treatment records and objective medical findings, R. 21–23;

and the conflicting medical opinions about her work-related restrictions, R. 23–24. Lisa did "have rather restrictive limitations due to her severe impairments," but her "record also show[ed] that [her] impairments [were] not totally debilitating as [she] alleged." R. 24. ALJ Smith found that Lisa could still do sedentary work, "occasionally" stoop, kneel, and climb ramps and stairs, and tolerate some "exposure to hazards including dangerous moving machinery, uneven terrain, and unprotected heights."[7] R. 19. She could not crouch, crawl, or climb ladders, ropes, and scaffolding. *Id.* This RFC was "supported by the objective medical evidence," Lisa's "activities of daily living, and the record as a whole." R. 24.

ALJ Smith gave "little weight" to the DDS physicians' opinions that Lisa was "limited to light exertion" work[8] with "some postural, manipulative, and environmental" restrictions because the record demonstrated "greater limitations, including greater exertional limitations, based on [Lisa's] ongoing pain symptoms and history of multiple surgeries." R. 23–24. She also gave "little weight" to Dr. Salomon's treating-source medical opinion that Lisa had "several exertional and postural limitations" because it was "inconsistent with the overall record." R. 23 (citing R. 436). Specifically, although Lisa had "ongoing physical pain symptoms," the medical record reflected "her examinations ha[d] nevertheless demonstrated fairly stable findings." *Id.* (citing R. 273, 496, 593, 759–60, 765, 771–72, 784). ALJ Smith's RFC finding matched both DDS physicians' opinions that Lisa could "occasionally" kneel and stoop (i.e., bend at the waist) and

---

[7] ALJ Smith's RFC finding also included limitations related to Lisa's severe COPD and carpal tunnel syndrome status-post bilateral hand surgeries. *See* R. 17, 19, 21–24. Lisa does not challenge those findings on appeal. *See* Pl.'s Br. 5–11.

[8] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b). Aside from the amounts of weight lifted and carried, "[t]he major difference between sedentary and light work is that most light jobs" require standing or walking for "most of the workday." SSR 83-14, 1983 WL 31254, at *4 (Jan. 1, 1983). Light work typically requires a total of six hours of standing and/or walking during a normal eight-hour workday, SSR 83-10, 1983 WL 31251, at *5–6, while sedentary work only requires about two hours, *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010).

sit for about six hours during a normal eight-hour workday, R. 75–76, 90, as well as Dr. Bacani-Longa's initial opinion that Lisa should "[a]void concentrated exposure" to hazards, R. 77. *See* R. 19. It further limited Lisa's exertional (lifting/carrying, standing/walking) and postural (balancing, crawling, climbing, crouching) capacities. *See* R. 19, 75–76, 90–91.

Finally, ALJ Smith found that Lisa's severe cervical-lumbar degenerative disc disease and bilateral hip-joint dysfunction "could reasonably be expected to produce" the debilitating pain Lisa described to the agency, but that her statements about the pain's "intensity, persistence, and limiting effects" were "not entirely consistent with the medical and other evidence in the record," R. 20. *See* R. 19, 24. She gave four reasons for rejecting Lisa's allegations that her pain was "totally debilitating." R. 24. First, Lisa "had fairly normal recoveries" from both hip replacements and her "overall condition . . . remained fairly stable over time with her surgical treatment." R. 21. Second, Lisa's "symptoms "appear[ed] to be improved" with "fairly conservative medication and physical therapy treatment despite her history of noncompliance" with physicians' rules for prescribing narcotic pain medications. R. 22. "[M]ore intensive treatment ha[d] not been recommended," which suggested Lisa's "current regimen" gave her "at least some control over her symptoms through . . . less invasive modalities." R. 23. Third, Lisa's physical exams generally were "within acceptable limits," R. 22, except on two occasions in mid-2016 when Lisa had "an antalgic gait [and] limited range of motion in her cervical spine," R. 23. Fourth, Lisa was "still able to carry out activities of daily living" despite her pain. *Id.*

C.      *Analysis*

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas*, 916 F.3d at 311. First, because RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related

activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). Second, the ALJ must provide a "narrative discussion describing" how specific medical facts and nonmedical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining how she weighed any conflicting or inconsistent evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. The ALJ does not need to mention all the evidence, but she "must evaluate the record fairly" and "may not ignore . . . evidence that is contrary to the [nondisability] ruling" generally, *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003), or to specific conclusions in the RFC assessment, *see, e.g.*, *Brown*, 873 F.3d at 267–72 (medical opinions); *Lewis*, 858 F.3d at 869–70 (clinical findings); *Monroe*, 826 F.3d at 189–91 (claimant's testimony). "Otherwise, it is impossible for a reviewing court to tell," *Golembiewski*, 322 F.3d at 917, whether the decision "was based on the entire record and supported by substantial evidence," *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). ALJ Smith's decision does not meet these standards.

Lisa asserts that ALJ Smith did not give "good reasons" for rejecting Dr. Salomon's medical opinion that because of her severe lumbar and hip pain Lisa cannot lift, bend, stoop, or walk more than one hundred feet, and frequently needs to change positions. Pl.'s Br. 5–6. Medical opinions are statements from "acceptable medical sources," such as physicians, that reflect the source's judgments about the nature and severity of the claimant's impairment, including her symptoms, prognosis, functional limitations, and remaining abilities. 20 C.F.R. § 416.927(a)(1). The ALJ must adequately explain the weight afforded to every medical opinion in the record, taking into account factors such as the nature and extent of the source's treatment relationship with the claimant; how well the source explained or supported the opinion; the

opinion's consistency with the record as a whole; and whether the opinion pertains to the source's area of specialty. *Id.* § 416.927(c). Medical opinions from treating and examining physicians typically deserve more weight than those from non-examining physicians, such as the DDS medical reviewers. *Brown*, 873 F.3d at 268; 20 C.F.R. § 416.927(c).

Lisa argues that ALJ Smith misapplied the "treating physician rule," *see* Pl.'s Br. 5–11, which sets out a special standard for ALJs to evaluate medical opinions from physicians who are "likely to be the medical professionals most able to provide a detailed, longitudinal picture" of the claimant's impairments, 20 C.F.R. § 416.927(c)(2). A treating source's medical opinion is "entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see* 20 C.F.R. § 416.927(c)(2). If the ALJ does not give a treating source medical opinion controlling weight, then she must consider the five regulatory factors "to determine what lesser weight should instead be accorded the opinion." *Brown*, 873 F.3d at 256; *see* 20 C.F.R. § 416.927(c)(2). "The regulation promises that the ALJ 'will always give good reasons in [the] decision for the weight'" assigned to a "'treating source's medical opinion.'" *Brown*, 873 F.3d at 256 (quoting 20 C.F.R. § 404.1527(c)(2)).

Most of Lisa's objections on this point are meritless. ALJ Smith found that Dr. Salomon was Lisa's "treating" physician, R. 23, so there is no reason to believe that she considered his opinion under the wrong legal standard, *see Winick v. Colvin*, 674 F. App'x 816, 820 (10th Cir. 2017) ("Had the ALJ properly analyzed Dr. Ganzell's opinion as a treating rather than an examining physician's opinion, he would have been obligated to follow the procedure for weighing a treating physician's opinion."). Moreover, Fourth Circuit caselaw does not require the ALJ to expressly "mention the concept of controlling weight" or "'complete a sequential

two-step inquiry'" when weighing a treating source's medical opinion. Pl.'s Br. 7, 8 (quoting

*Chrisman v. Colvin*, 531 F. App'x 893, 900 (10th Cir. 2013)). It requires the ALJ to reasonably

explain why the physician's opinion merited less-than controlling weight. *See Sharp v. Colvin*,

660 F. App'x 251, 256–57 (4th Cir. 2016) (citing *Monroe*, 826 F.3d at 190–91); *Bishop*, 583 F.

App'x at 67. The court "must defer to the ALJ's assignments of weight" unless her underlying

findings or rationale "are not supported by substantial evidence" in the record. *Dunn v. Colvin*,

607 F. App'x 264, 271 (4th Cir. 2015); *see Sharp*, 660 F. App'x at 256–57; *Bishop*, 583 F.

App'x at 67.

Here, ALJ Smith found that Dr. Salomon's opinion of Lisa's "exertional and postural

limitations" was "inconsistent with" identified medical records showing "fairly stable findings"

on examinations despite Lisa's "ongoing physical pain symptoms."[9] R. 23 (citing R. 273, 496,

593, 759–60, 765, 771–72). This is a legitimate reason to discount a treating physician's opinion.

*See* 20 C.F.R. § 416.927(c)(4). The problem, however, is that ALJ Smith never explained *how*

those findings logically supported her conclusion. *See Woods*, 888 F.3d at 694 ("[T]he ALJ must

*both* identify evidence that supports his conclusion *and* build an accurate and logical bridge from

[that] evidence to his conclusion." (quotation marks omitted)). The cited records reflect varied

findings: Lisa's gait was normal on some exams, R. 273 (Sept. 2014); R. 765 (Aug. 2016); R.

---

[9] The Commissioner asserts that ALJ Smith "articulated [other] specific and legitimate reasons" for discounting these "extreme" limitations, including that Lisa's pain "improved" with medication and hip surgery, that diagnostic studies showed her "lumbar and cervical conditions were fairly stable or had improved" over time, and that Lisa's physical exams "were generally within 'acceptable limits.'" Def.'s Br. 16–17 (quoting R. 22), ECF No. 17. Those reasons appear in the ALJ's analysis of Lisa's testimony describing allegedly disabling pain, R. 20–23, not in her separate discussion of Dr. Salomon's medical opinion. R. 23. Because ALJ Smith's explanation for the weight accorded this opinion clearly "relied on and identified [one] particular category of evidence," *Sharp*, 660 F. App'x at 257, I will not "speculate" about what other findings the ALJ could have made or "hypothesize" different "justifications that would perhaps find support in the record," *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015). *See Bates v. Berryhill*, 726 F. App'x 959 (4th Cir. 2018) (citing *Patterson v. Bowen*, 839 F.2d 221, 225 n.1 (4th Cir. 1988)). Moreover, as explained below, the ALJ's specific reasons for discounting Lisa's subjective statements do not withstand scrutiny on this record.

774 (Mar. 2016), but antalgic or abnormal on others, R. 759 (Sept. 2016); R. 771 (June 2016).

She had a "[n]egative straight leg and cross leg maneuver" in February 2015, R. 496, but a

"positive [straight leg test] at 30 degrees on both sides" and limited lumbar range of motion in

June 2016, R. 771. The records do show Lisa often had limited or painful range motion in the

lower back or right hip, R. 496, 593, 759–60, 771–72, which is not obviously "inconsistent

with," R. 23, Dr. Salomon's opinion that Lisa could not bend, stoop, stay in one position, or walk

more than one hundred feet after her total right hip arthroplasty, R. 436. ALJ Smith's "failure to

build an accurate and logical bridge from th[is] evidence" to her contrary conclusion is reversible

error. *Lewis*, 858 F.3d at 868 (quotation marks omitted).

Moreover, ALJ Smith "overlook[ed] critical aspects of [Lisa's] medical treatment,"

*Lewis*, 858 F.3d at 867, that were not inconsistent with Dr. Salomon's opinion. Several exam

records show that Lisa had an abnormal gait, R. 283, 487, 759, 771, 778; used a walker for

standing/walking, R. 398, 740–41, 749, 750; exhibited decreased range of motion in the lumbar

spine or either hip joint, R. 283, 390–91, 482, 487, 490, 678, 781; and/or endorsed tenderness in

the cervical or lumbar back, R. 784, 390–91, 522, 593, 598, 676. Dr. Brown instructed Lisa after

both hip-replacement surgeries to bear weight on the operative extremity only as tolerated; to

stop and rest if she noticed pain while walking; to stand up and move around periodically; and to

avoid crossing her legs, internally rotating the operative hip, and sitting in a position or doing

"any other activity where an angle of roughly 90 degrees would be made between [the] thigh and

stomach." R. 424–26 (Jan. 2015); R. 746–48 (Apr. 2016). In March 2014, Dr. Grice noted Lisa

was "having extreme lumbosacral pain and had extreme difficulty ambulating secondary to the

pain." R. 374. Two years later, Dr. Hawkins observed Lisa was "limping considerably" and

walked with an antalgic gait. R. 778 (Feb. 2016). He opined that Lisa had a "significant pain

issue w[ith] the left hip" and twice prescribed enough narcotic pain medications to "get her through" until she had that hip replaced in April 2016. *Id*. ALJ Smith did not mention any of these findings. Thus, I cannot tell whether she fairly considered and rejected them in favor of the evidence she chose to cite, *see Thomas*, 916 F.3d at 312, or whether she impermissibly "cherrypick[ed] facts" that supported her conclusion "while ignoring evidence that point[ed] to a disability finding," *Lewis*, 858 F.3d at 869. Her failure to "address conflicting evidence, or [to] explain away contrary findings from other doctors in a comprehensive manner" is reversible error. *Patterson*, 846 F.3d at 662; *see Thomas*, 916 F.3d at 312; *Lewis*, 858 F.3d at 869.

* * *

I take no position on whether Lisa is entitled to disability benefits for the relevant period. On remand, the Commissioner must consider and apply the applicable legal rules to all the relevant evidence in the record; explain how any material inconsistencies or ambiguities were resolved at each critical stage of the determination; and, assuming Lisa cannot prove that she was disabled based on the medical evidence alone, provide a logical link between the evidence she found credible and the RFC determination. Additionally, although Lisa did not raise the issue in her brief, I direct the next ALJ to consider Lisa's statements about her pain both "in the context in which they were made," *Vincent v. Colvin*, No. CIV-15-610, 2016 WL 5373031, at *7 (W.D. Okla. Sept. 26, 2016), and "in the context of the entire record," *Howard v. Berryhill*, 1:18cv156, 2018 WL 7133259, at *3 (M.D.N.C. Dec. 27, 2018). *See Hines*, 453 F.3d at 565 (ALJ's sedentary RFC finding "was not supported by substantial evidence [where] the record, when read as a whole, reveal[ed] no inconsistency between" claimant's minimal daily activities and alleged limitations).

A claimant's description of her pain is an important part of the RFC assessment. *Mascio*,

780 F.3d at 639. Lisa maintained that she could not work primarily because constant pain in her neck, back, and hips severely restricted her capacities to lift/carry more than a few pounds; to sit, stand, and/or walk for prolonged periods; and to bend, stoop, kneel, climb stairs, or navigate uneven ground. ALJ Smith agreed Lisa had "rather restrictive limitations," and, by restricting Lisa to sedentary work with postural and environmental limitations, she apparently credited Lisa's testimony that pain "limited her ability to perform many exertional [and] postural" functions like "lifting and walking for prolonged periods" or "walking on uneven surfaces." R. 20; *see* R. 19, 23–24. Yet, the ALJ apparently rejected Lisa's consistent allegations (and Dr. Salomon's opinion) that she needed to switch positions because of her lower back and hip pain. *See* R. 48–49, 52, 71, 213–17, 436. She did not "explain how [s]he decided which of [Lisa's] statements to believe and which to discredit," other than in her (implicit) boilerplate conclusion that she "did not believe any claims of limitations beyond," *Mascio*, 780 F.3d at 640, those included in the RFC finding. *See* R. 19, 23–24.

ALJ Smith's specific reasons why Lisa's pain was "not totally debilitating," R. 24, also do not withstand scrutiny. *See Hancock*, 206 F. Supp. 2d at 764 ("A district court will no[t] . . . revisit the ALJ's resolution of conflicting evidence. However, if the ALJ appears, without stating a reason, to have credited some probative evidence over other evidence or to have ignored evidence altogether, a remand or reversal may be necessary."). For example, the ALJ correctly noted that Lisa reported "improved pain tolerance" and "better" or "well-controlled pain" after both hip replacements, R. 22 (citing R. 412, 664, 668, 700), but she omitted that Lisa made those statements in a hospital setting and only after doctors gave opioid analgesics (e.g., Dilaudid, Fentanyl) to supplement her home medications, R. 412, 620, 628, 664–68, 700–02. *See Thomas*, 916 F.3d at 312. Lisa had "inconsistently controlled postoperative pain" while hospitalized in

April 2016, R. 717, and she reported "significant" or "increased" left hip pain, even though the hardware looked stable, at several clinic visits over the next five months, R. 749, 750, 758–60, 769–70. Lisa also repeatedly told providers that her severe neck, back, and hip pain was not controlled by medication, *see, e.g.*, R. 271, 280, 374, 387–88, 397–99, 479, 482, 495, 502, 503, 507, 589–90, 594, 602–03, 656, 671–73, 677, 773–74, 778, 783–84, but ALJ Smith did not mention any of those statements. *See Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001) (reversing where, "[w]ithout explanation, the ALJ passed over significant probative record evidence and deemed crucial testimony incredible"). The ALJ's finding that Lisa's physical exams typically were "within acceptable limits," R. 24, fails because she did not mention other exams where Lisa's gait, station, and/or range of motion in the neck, lower back, and hips were notably abnormal, *see, e.g.*, R. 283, 390–91, 398, 482, 487, 740–41, 749, 750, 759, 771, 778, 781. *See Thomas*, 916 F.3d at 312; *Patterson*, 846 F.3d 662; *Lewis*, 858 F.3d at 869.

ALJ Smith's characterization of Lisa's treatment as "fairly conservative medication and physical therapy," R. 22, is "difficult to reconcile with the record," *Lewis*, 858 F.3d at 868. Lisa "has a documented and exhaustive [treatment] history" for her chronic degenerative disc and joint disorders, *Lewis*, 858 F.3d at 868, including two total hip replacements followed by inpatient and in-home physical therapy, R. 407, 410, 412, 420–21, 482, 740–41; several rounds of cervical-lumbar trigger point injections, R. 265, 269, 275, 287, 362, 372, 393, 514, 542, 586, 601–02; failed bilateral lumbar facet joint injections, R. 382–83, 388; and multiple daily doses of combined powerful analgesics and muscle relaxants, *see, e.g.*, R. 370–71, 387–88, 397–99, 502, 503, 783–84. She had both hips replaced in her late 40s because "conservative management" failed, R. 407, 698, not because "less invasive modalities" gave her "at least some control over her symptoms," R. 23. Lisa testified that doctors planned injections to treat her postoperative

pain (despite the stable hardware) and possible bursitis in the left hip, but that it was still "too soon after surgery to do so." R. 42. "[M]ore intensive treatment ha[d] not been recommended" for her cervical-lumbar spine impairments, R. 23, because Dr. Shimer expressly advised against surgery for this kind of neck and back pain, R. 274. He recommended that Lisa continue with medications and injections, R. 274, which she did throughout the relevant period. Trigger point injections provided "some" pain relief, R. 397, 518, but they were not a permanent solution, R. 44, 271. ALJ Smith needed to explain how this evidence factored into her conclusion that Lisa's allegedly uncontrolled pain was out of proportion to the "conservative" nature or "degree of medical treatment required," R. 22–23. *See Lewis*, 858 F.3d at 868; *Dunn*, 607 F. App'x at 273–75. She did not even mention it.

ALJ Smith also did not explain why Lisa's "history of noncompliance" with medication agreements, R. 22 (citing R. 638, 780–81), undercut her complaints of debilitating pain. Most doctors declined to prescribe long-term narcotics for this reason, R. 371, 506, 638, 781, 785, but several physicians still gave Lisa those medications to supplement her non-opioid treatment regimen, *see, e.g.*, R. 482, 495, 502, 503, 516, 586, 589–90, 594, 703–04, 778. In February 2016, Lisa admitted taking Percocet and Methadone "from friends and family" because she believed doctors would not "give her anything" stronger for her hip pain. R. 777; *see* R. 781. She had not seen Dr. Salomon in several months, R. 22, because he discharged her from his practice for taking more Percocet than he prescribed, R. 780. Perhaps ALJ Smith meant to find that Lisa's "noncompliance" evinced drug-seeking behavior rather than a misguided but genuine attempt to ease her pain. *See Bagbey v. Colvin*, 3:13cv298, 2014 WL 791871, at *11 (E.D. Va. Feb. 24, 2014). But she did not do so expressly, and, even if she had, she needed to both identify evidence she "believe[d] tended to discredit" Lisa's testimony describing debilitating pain and "build an

accurate and logical bridge from th[is] evidence to [her] conclusion that [Lisa's] testimony was not credible." *Monroe*, 826 F.3d at 189 (quotation marks omitted); *see Carla B. v. Saul*, No. 5:18cv74, 2019 U.S. Dist. LEXIS 139559, at *23–25 (W.D. Va. Aug. 19, 2019), *adopted by* Order (Sept. 9, 2019), ECF No. 24. I cannot conduct "an analysis that the ALJ should have done in the first instance." *Fox*, 632 F. App'x at 755.

Finally, ALJ Smith's finding that Lisa's symptoms were "not entirely consistent with . . . her activities of daily living," R. 23, falls short for two reasons. First, the activities that ALJ Smith found Lisa could perform—e.g., preparing "simple" meals, talking to people every day, "independently accomplish[ing] self-care tasks," going to the grocery store, and "rarely" driving a car—were modest and could be performed as Lisa's pain permitted. *See Hines*, 453 F.3d at 565–66; *Parker v. Astrue*, 664 F. Supp. 2d 544, 555 (D.S.C. 2009). ALJ Smith did not explain "how the[se] particular activities . . . showed that [Lisa] could persist through an eight-hour workday" five days a week. *Brown*, 873 F.3d at 263. Second, she did not address evidence that conflicted with her finding about Lisa's ability to perform those activities. *See Hines*, 453 F.3d at 565. Shortly before Lisa had her second THA surgery, for example, she reported using a walker for "[i]ndependent functional" ambulation at home and a motorized scooter at the grocery store. R. 726; *see also* R. 709. Her sister helped with "lower body" self-care tasks because Lisa had "severe back and hip pain." R. 726. Dr. Brown twice instructed Lisa not to drive for at least six weeks during the relevant period. R. 424–26 (Jan. 2015); R. 746–48 (Apr. 2016). In short, ALJ Smith's failure to address this evidence precludes meaningful judicial review.

## IV. Conclusion

For the foregoing reasons, the Court will **DENY** the Commissioner's motion for summary judgment, ECF No. 16, **REVERSE** the Commissioner's final decision, **REMAND** the

matter for further proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket. A separate order will enter.

The Clerk shall send certified copies of this Memorandum Opinion to the parties.

ENTER: September 23, 2019

Joel C. Hoppe
United States Magistrate Judge